**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DARRIN KONSA,** *Plaintiff*, | § | **CIVIL ACTION NO.** |
| **v.** | § | |
| | § | |
| **PERFORMANCE FOOD GROUP INC., PERFORMANCE TRANSPORTATION LLC d/b/a PERFORMANCE FOODSERVICE,** *Defendant.* | § | ____________________ |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

COMES NOW, Darrin Konsa ("Plaintiff" or "Konsa"), and files this Original Complaint and Jury Demand and would respectfully show the following:

## I. PARTIES

1. Konsa is citizen of the United States and a resident of Burleson, Tarrant county, Texas.

2. Defendant, Performance Food Group, Inc., ("Defendant" or "PFG") is a Colorado corporation. PFG may be served by service on its registered agent: may be served by service on its registered agent: National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3. Defendant, Performance Transportation, LLC d/b/a Performance FoodService., ("Defendant" or "PFS") is a Delaware corporation with its principal office Virginia. PFS may be served by service on its registered agent: National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## II. JURISDICTION

4. Jurisdiction of this Court is based on the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105 *et seq*.

5. Konsa originally filed this matter with OSHA, Department of Labor, Dallas, Texas, on or about May 22, 2024. The complaint is currently pending appeal, OALJ Case Number 2024-STA-00113 and OSHA Case: 301038839. This matter has been pending more than 210 days with the Secretary of Labor and the delay is not due to bad faith of Konsa, and he therefore brings this action for de novo review.

6. Konsa also asserts claims for disability discrimination and retaliation under the Americans with Disabilities Act and retaliation under the Family Medical Leave Act.

## III. FACTS

7. Defendants hired Konsa as Director of Transportation for the Dallas Operations Center ("OpCo") on July 18, 2022. Konsa brought Defendants over twenty years of transportation industry and management experience. Konsa is a recovering alcoholic who suffers from anxiety, major depressive disorder and ADHD. Konsa was assigned to report to Vice President of Operations Ray Alizzi ("Alizzi"). George Bene ("Bene") assumed the role of Vice President of Operations in September of 2023.

8. Konsa received nothing but positive feedback until he reported significant DOT safety issues and requested additional help as an accommodation for his disability. Konsa had the following accomplishments during his tenure with Defendants:

- Implemented driver bid to level out driver pay and work;
- Organized first ever driver led safety committee.
- Responsible for the only KPI measurement for Dallas OpCo to decrease in FY 2024 due to achieving goal in FY 2023.
- Invited to Regional Vice President's yearend review. An honor designated for one person per Operation who demonstrates the ability to lead and move up to staff level management.
- Chosen by all staff level management to be the master trainer for the Operational Management Leadership class in 2023 for Dallas.

9. In July 28, 2023, Alizzi demoted the Manager of Transportation to a Supervisor. Leaving Konsa without a Manager for well over six months. Between November 2023 and January of 2024, three of the four supervisors over transportation left the company. This left Konsa with

only a single supervisor to support him in the management of the Dallas OpCo. Konsa was forced to work fourteen to sixteen hour days every day and cancel his vacation to complete all the work.

10. To complicate matters, Bene would not allow Konsa to hire anyone to replace the manager and supervisors. Bene claimed that they could not hire because of budget restraints and that he also wanted to get a better understanding of the operation before they hired. Konsa believes that there were not any budget restraints that preventing Defendants from filling the open manager and supervisor positions.

11. Konsa's anxiety and depression were exacerbated by the long hours he was working, and he began to suffer anxiety attacks. Konsa felt overwhelmed by stress and found himself struggling to maintain his sobriety. On November 8, 2023, during a dinner meeting, Konsa told Bene about his anxiety and alcoholism and that the long hours were affecting his health. He further told Bene that he could not keep working like this and needed some help.

12. On December 8, 2023, Konsa learned that Supervisor Dietrick French ("French") allowed Robert Llanas ("Llanas") to drive a route after working a full shift in the yard. Konsa questioned French regarding the amount of driving time that Llanas had left and if he could complete the route before he was over the allowed hours of service. French responded that he did not check and did not know.

13. Konsa told Safety Manager Patricia Sealey ("Sealey") and Bene that he had learned of a potential DOT violation by French and Llanas and that he needed to review Llanas time records to verify his concern. After reviewing the time records, Konsa reported to Sealey and Bene that French allowed Llanas to willfully violate DOT regulations and requested that they contact human resources. French and Llanas were eventually terminated for this violation.

14. After December 11, 2023, when French was suspended pending termination, Konsa complained to Bene that he could not keep working this many hours and that he needed help. Also,

during the investigation of the DOT violation, Konsa complained to Vice President of human resources Yolanda Dupree ("Dupree") about how bad it was to only have one supervisor and that he could not keep doing this. He told her we need to open the requisitions so that we can hire a manager, more supervisors and fill the open router/mapper roles.

15. In December 2023 or early January 2024, Konsa learned that driver Greg Gannon ("Gannon") had completed his route and then taken a second route. Knowing that he would run out of service time during the second route, Gannon purposefully took a rental truck that did not have a computer so that his time could not be easily tracked. Konsa reported to Bene that Gannon willfully violated DOT regulations. Bene responded that "we have a plan in place, and we are going to talk to them". Konsa reminded Bene that they had already talked to the drivers and urged Bene to terminate Gannon to remain consistent with Defendants' messaging that drivers will be terminated for willful violations of the DOT hours of service regulations. Bene refused to terminate Gannon.

16. In January of 2024, Konsa told Bene that the long hours were making his depression and anxiety worse and threatening his sobriety. Konsa told Bene, "my health issues and sobriety are more important to me than any job. In twelve plus years of being sober, I have never felt such a strong desire to drink than I have had in the past two to three weeks and that scares the hell out of me. If I cannot get the resources, I need to properly run the operation I am going to have to quit." When it became clear that Bene was not willing to hire anyone, Konsa suggested that one option would be a plan similar to what Defendants offered Ronald Mitchelle to agree to work thirty to ninety days before resigning.

17. Bene told Konsa that he would have to talk to the Division President and get back to Konsa. Following this conversation Konsa spoke with Executive Vice President of Dallas OpCo Shibu John ("John") and explained to him that he wanted to keep working for Defendants but

needed help because working so many hours was taking a significant toll on his health. John assured him that they wanted to keep him on and would work with him to get him the help that he needed. Konsa had multiple conversations with John about the need for help and how the long hours were affecting his health.

18. The next week there was bad weather, and Bene stepped in and helped the department and brought in extra help to answer the phones. Konsa told Bene that things were improving and that if things continued to improve and if Bene would work with him to hire more people that he would no longer need to put in his resignation.

19. Bene responded that "we need to think about what is best for the business." Konsa responded, "You know I only suggested resigning because I cannot sacrifice my health and my sobriety for any job. Konsa told Bene again that if you can get me some help I will stay on. Bene then told Konsa that he would decide what was best for PFG and for Konsa and would let him know.

20. When Bene didn't come back to Konsa with a decision, Konsa spoke again with John and asked if Defendants intended to let him keep his position because if they were not going to keep him around, he wanted to apply for an open position with a sister company. John said, "I thought you were all in for PFG, it sounds like you just want a job". Konsa told John, "I was struggling with health and only offered to resign because despite numerous requests for help, nothing was getting better. John said, "well this job is always going to be stressful, so you are probably just better just moving on". Konda reminded John, "all I was asking for was help."

21. On January 25, 2024, Konsa's physician placed him on medical leave to manage his increased anxiety and depression. Konsa was approved for FMLA leave until February 29, 2024, which was later extended until March 4, 2024.

22. On or about February 1, 2024, Plaintiff sent a letter a formal letter of complaint to Defendants through Ron Tolbert in PFG corporate human resources. This letter stated:

> I have been working for Performance Food Group in Dallas, Texas since July 2022. During this time, I have brought numerous concerns to my superiors regarding current business practices, physical altercations regarding previous employees from staff level management and my own personal health issues. None of these concerns have been addressed and in fact, has caused such trauma in my life that I was taken off work by my primary physician last week. After discussing this with my doctor, he suggested that I contact an attorney based on potential violations of the ADA and employee protection laws. . .
>
> During my time as the Director of Transportation at the Dallas OpCo, I had to report to both my direct boss, George Bene and the VP of HR, Yolanda Dupree, instances of employees willfully violating DOT hours of service rules. When I reported this, I also reported that one of the supervisors allowed them to violate the hours of service and ultimately both the driver and supervisor were terminated. Several weeks after this, I again brought to the attention of George Bene, another driver that willfully violated HOS rules. This was another well tenured employee and also a friend of one of Yolanda's employees in HR. No disciplinary action was taken against Greg Gannon, the driver whom violated hours of service. Juan Franco, a transportation supervisor was present when I had this discussion with Mr. Bene.
>
> For the past several months, my department has been depleted of supervisors and office personnel due to the way we have been treated. When I started working as the Director of Transportation, I had a manager, four supervisors, a coordinator and two support positions. Up until several weeks ago, I was running the department with only one supervisor and one support person. I had been scheduled to work 12-hour shifts, work six days a week, I had my vacation cancelled and for much of my time in the office, I was the only person working. I have discussed my personal health concerns with my direct manager, George Bene, on many occasions over the past several months. Indicating to him that I am an alcoholic, sober for over 12 years, and I have struggled with my sobriety more and more due to the continued expectations to keep the department running with minimal support. After several attempts to see my doctor, due to weather related conditions, I was able to speak to my primary care physician on January 25th, who took me off work to address multiple health issues regarding work related issues for four weeks.

23. On March 4, 2024, Bene and Dupree met with Konsa and told him that PFG was accepting his resignation and terminating his employment. Konsa told them that he never resigned and had only told Bene that if he didn't get additional help, he was going to have to resign so his health was not compromised. Telling Bene "if you would have addressed my concerns to provide

additional help, this would have never happened." Dupree told Konsa, "nothing is going to change, we have already made our decision."

24. Upon information and belief, during Konsa's medical leave, Defendants hired a manager, two supervisors and a director. Since Konsa's termination, Defendants hired two additional admins to answer the phones and one additional supervisor, filling roles which had been open for many months. Additionally, Defendants hired French back despite the fact that he was previously terminated for willful violations of DOT regulations.

25. Konsa asserts that Defendants terminated him because of his protected complaints about DOT violations and his disclosed disability and medical leave. Konsa further believes that Bene refused to allow him to hire replacement employees to punish him for his protected conduct in reporting the DOT violations and reporting other violations.

## IV. <u>JOINT EMPLOYER</u>

26. PFG and PFS are joint employers under the Single Employer/Integrated Enterprise Doctrine. Distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise. In order to hold Defendants liable under this doctrine, Plaintiffs must establish (1) an interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. The primary focus of this analysis in employment cases is often on the second factor - whether there is centralized control of labor relations.

27. The EEOC has long endorsed the "integrated enterprise" theory to determine whether "the operations of two or more employers are considered so intertwined that they can be considered the single employer of the charging party." EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44-45.5 Under the EEOC's interpretation of Title VII, "[t]he separate entities that form an integrated enterprise are treated as a single employer for purposes of

both coverage and liability," and "relief can be obtained from any of the entities that form part of the integrated enterprise." *Id.* at 44.

28. Here PFG and PFS have interrelated operations and common management though the shared = headquarters, shared accounting, legal, IT and human resource functions, shared and shared operations. PFG and PFS have common financial control and ownership and share certain policies, procedures and management.

## V. CAUSES OF ACTION

### COUNT 1 - § Surface Transportation Assistance Act

29. Kosa incorporates paragraphs 7 through 25 as though fully set forth herein.

30. Defendants qualify as a "commercial motor carrier" under 29 C.F.R. § 1978.01 because they "are engaged in a business affecting commerce between States or between a State and a place outside thereof who owns or leases a commercial motor vehicle in connection with that business."

31. Under STAA an employer may not "discharge an employee or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because – (A) the employee…has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety regulation, standard, or order….49 U.S.C. § 31105(a)(1)(A).

32. Konsa was an "employee" under the act because as Director of Transportation for the Dallas Operations center, Konsa directly affected commercial motor vehicle safety or security in the course of his employment; and was not an employee of the United States Government, a State, or a political subdivision of a State acting in the course of employment.

33. Defendants owns commercial motor vehicles in connection with their business and assigns employees to operate such vehicles and thus are "employer(s)" under STAA.

34. Konsa engaged in protected activity under the statute when he made numerous

internal complaints to supervisors, human resources and safety personnel concerning motor vehicle safety hazards, including the complaints about French, Llanas and Gannon.

35. Defendants were aware of Konsa's protected activity because he complained to Sealey and Bene. By refusing to hire additional help or providing Konsa support and by terminating Konsa, Defendants took adverse actions against him. These adverse actions were because of Konsa's protected activity and was intentional.

36. As a result of Defendants' unlawful retaliation, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with his employment.

37. As a result of Defendants' unlawful retaliation, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

38. At all relevant times, Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

39. Defendants' actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federally protected rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

**Count Two –Americans with Disability Act – Disability**

40. Plaintiff incorporates Paragraphs 7 – 25 as though fully set forth herein.

41. At all times material to this action Defendants were "employers" as defined by 42 USC § 12111(5)(A). Defendants are therefore subject to the provisions of the Americans with Disabilities Act.

42. Plaintiff's mental health conditions limited his ability to focus, concentrate, communicate, sleep, and deal with unnecessary stress.

43. Plaintiff was qualified for his position as demonstrated by his extensive experience, training and performance feedback.

44. By terminating his employment, Defendants took an adverse action against him. Defendant took such adverse action because of Plaintiff's disabilities and requests for accommodation.

45. Alternatively, Defendants' failure to respond to Plaintiff's requests for accommodation and provide Plaintiff with additional support, help and resources resulted in Plaintiff's constructive discharge and were the reason why Plaintiff threatened to quit if he did not get additional support or resources.

46. As a result of Defendants' unlawful discrimination, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with his employment.

47. As a result of Defendants' unlawful discrimination, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

48. At all relevant times, Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

49. Defendants' actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federally protected rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

**Count Three–Americans with Disability Act – Failure to accommodate**

50. Plaintiff incorporates Paragraphs 2-25 as though fully set forth herein.

51. At all times material to this action Defendants were "employers" as defined by 42 USC § 12111(5)(A). Defendants are therefore subject to the provisions of the Americans with

Disabilities Act.

52. Plaintiff's mental health conditions limited his ability to focus, concentrate, communicate, sleep, and deal with unnecessary stress.

53. Plaintiff was qualified for his position as demonstrated by his extensive experience, training and performance feedback.

54. Defendant failed to accommodate Plaintiff by failing to hire additional help or provide Plaintiff additional resources after numerous requests. Although Plaintiff told multiple people including Bene, John and Dupree that the stress and workload were affecting his health and threatening his sobriety, Defendants failed to view Plaintiff's requests as requests for accommodation and failed to engage in the interactive process.

55. Defendants refusal to accommodate Plaintiff's disability or engage in the interactive process forced Plaintiff to threaten to quit if he was not provided more resources or support. Defendants then used this threat as a basis for Plaintiff's termination.

56. Alternatively, Defendants' failure to respond to Plaintiff's requests for accommodation and provide Plaintiff with additional support, help and resources resulted in Plaintiff's constructive discharge and were the reasons Plaintiff threatened to quit if he did not get additional support or resources.

57. As a result of Defendants' failure to accommodate, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with his employment.

58. As a result of Defendants' failure to accommodate, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

59. At all relevant times, Defendants acted with malice and/or reckless indifference to

Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

60. Defendants' actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federally protected rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

**Count Four- Americans with Disabilities Act- Retaliation**

61. Plaintiff incorporates Paragraphs 7-25 as though fully set forth herein.

62. At all times material to this action Defendants were "employers" as defined by USC § 12111(5)(A). Defendants are therefore subject to the provisions of the Americans with Disabilities Act.

63. Plaintiff engaged in protected conduct as defined when he complained to Bene, John, Dupree and sent the letter. Plaintiff opposed disability discrimination by complaining about his discriminatory treatment and potential violations of the ADA.

64. Plaintiff was qualified for his position as demonstrated by his extensive experience, training and performance feedback.

65. Defendants were aware of Konsa's protected activity because he complained to Sealey and Bene. By refusing to hire additional help or providing Konsa support and by terminating Konsa, Defendants took adverse actions against him. These adverse actions were because of Konsa's protected activity and was intentional.

66. As a result of Defendants' unlawful retaliation, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with his employment.

67. As a result of Defendants' unlawful retaliation, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

68. At all relevant times, Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

69. Defendants' actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federally protected rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

**Count Five– Family and Medical Leave Act – Retaliation**

70. Plaintiff incorporates paragraphs 6-25 as though fully set forth herein.

71. The FMLA prohibits retaliation for availing oneself of his rights under the FMLA. Plaintiff must show that he was protected under the FMLA, he suffered an adverse employment action, and that a causal link exists between the protected activity and the adverse action.

72. In this case, as set forth above, Plaintiff was protected under the FMLA. He took FMLA leave to treat his mental health conditions, and he was singled out for termination after he returned from FMLA leave. These actions were taken because he exercised his right to take FMLA leave.

73. As a result of Defendants' unlawful retaliation, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with his employment.

74. As a result of Defendants' unlawful retaliation, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

75. At all relevant times, Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks liquidated damages.

76. Defendants' actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federally protected rights in this action.

Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

## VI. REQUEST FOR RELIEF

77. Konsa has no plain or adequate remedy at law to correct the wrongs complained of herein and has thus instituted this suit for damages. Further, Konsa is now suffering and will continue to suffer irreparable injury from Defendants' policies, practices, and actions set forth herein.

78. Konsa respectfully requests that this Court grant him "all relief necessary to make the [him] whole," including all damages, declaratory relief and injunctive relief provided for under the relevant statutes:

a. A declaratory judgment, declaring Defendant's past practices herein complained of to be unlawful.

b. Back pay, front pay, pension benefits, stock options, bonuses, health benefits, and any other relief necessary to compensate Plaintiff.

c. Punitive and liquidated damages.

d. Prejudgment and post-judgment interest.

e. Attorney's fees necessary for prosecution of Plaintiff's claims.

f. Costs for the prosecution of Plaintiff's claims, including the costs of expert witness fees; and

g. Such other general relief to which Plaintiff shows himself justly entitled.

## VII. JURY DEMAND

79. Plaintiff requests that all ultimate fact issues be submitted to a jury for determination. She has paid the jury fee.

Respectfully Submitted,

__________________________

Jane Legler
Texas Bar No. 03565820
Kyla Gail Cole
Texas Bar No. 24033113

Cole Legler PLLC
3300 Oak Lawn Ave., # 425
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com